**SO ORDERED.**

**SIGNED this 20 day of April, 2006.**

_____
**J. Rich Leonard
United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

IN RE:

SOUTH BRUNSWICK WATER
& SEWER AUTHORITY,

    Debtor.                                             Case No. 04-09053-8-JRL
                                                         Chapter 9

_____

**MALCOLM GRISSETT, BOBBIE
DILLARD, MOSES E. STANLEY, SAM
SOMMERSETT AND B & M PROPERTIES
OF THE CAROLINAS, LLC, on behalf of
themselves, and all others similarly situated,**

    Plaintiff(s)

    v.                                                  Adversary Proceeding No.
                                                         06-00014-8-JRL

**SOUTH BRUNSWICK WATER AND
SEWER AUTHORITY, a North Carolina
water and sewer authority, and JOSEPH A.
TOMBRO, in his official capacity as
Executive Director of SOUTH BRUNSWICK
WATER AND SEWER AUTHORITY,
RUSSELL B. PRICE, in his capacity as
Chairman of SOUTH BRUNSWICK WATER
AND SEWER AUTHORITY, GEORGE W.
KNOTT, in his official capacity as Vice
Chairman and Chairman of SOUTH**

**BRUNSWICK WATER AND SEWER AUTHORITY, DONALD F. LOWRY, in his official capacity as Secretary/Treasurer of SOUTH BRUNSWICK WATER AND SEWER AUTHORITY, JENNINGS D. EDGE, in his official capacity as Director and Finance Officer of SOUTH BRUNSWICK WATER AND SEWER AUTHORITY, BARRY BELFORD, in his official capacity as Director and Vice Chairman of SOUTH BRUNSWICK WATER AND SEWER AUTHORITY, and BOB CHAPMAN and W ROBERT ELKER in their official capacity as Directors of SOUTH BRUNSWICK WATER AND SEWER AUTHORITY,**

        **Defendant(s).**

## ORDER

This case is before the court on final approval of the proposed class action settlement, pursuant to Rule 7023 of the Federal Rules of Bankruptcy Procedure and Rule 23(e) of the Federal Rules of Civil Procedure.[1] On March 15-16, 2006, the court conducted a hearing on this matter.

On January 23, 2006, the court approved a notice to the public regarding the proposed settlement. On February 8, 2006, the plaintiffs posted the notice along with a copy of the settlement agreement at the Brunswick County Courthouse. The notice described the lawsuit and the pertinent terms of the settlement, and it announced the date of the subject hearing. It also gave the public an opportunity to object to the settlement by providing written notification to counsel for the plaintiffs and the debtor postmarked by March 3, 2006. The notification indicated that, if one failed to object in accordance with the notification, then one would forfeit the right to object to the terms of the

---

[1] The related but distinct issue of approval of the compromise under Bankruptcy Rule 9019 is dealt with in a separate order.

settlement and would be bound by the decision of the court. On February 9, 2006, the plaintiffs published the approved notice in *The Brunswick Beacon*, a weekly newspaper with a high circulation in Brunswick County. Counsel received one inquiry regarding the proposed settlement but no objections.

In summary, the proposed settlement resolves all claims, known and unknown, and provides: (1) a cash settlement fund totaling $550,000.00, which consists of $350,000.00 from South Brunswick Water and Sewer Authority ("SBWSA") and $200,000.00 from SBWSA's insurer, the Interlocal Risk Financing Fund of North Carolina ("IRFFNC"); (2) cancellation of all liens and judgments filed by SBWSA for the non-payment of levied fees and assessments; (3) forgiveness of all outstanding accounts receivables due and owing for the nonpayment of stormwater fees; (4) 30% of any net recovery from SBWSA's pending adversary proceeding against Ocean Isle Developing Co.; and (5) 30% of any net residual assets after all distributions under SBWSA's plan have been made. After payment of attorneys fees and expenses, funds shall be distributed on a pro-rata basis to class members who have made payments for stormwater fees from 1995 to 2003. Funds that are not distributed to class members will be used to provide reduced fees to certain low-income families or handicapped individuals who may qualify in the SBWSA planning area.

The court has now reached the second stage of the settlement approval process, known as the fairness hearing. The main purpose of the fairness hearing is "to determine if the proposed settlement is fair, reasonable, and adequate." Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 855 F. Supp. 825, 827 (Bankr. E.D.N.C. 1994). The Fourth Circuit has adopted factors for consideration that separately address the fairness and adequacy of the proposed settlement. Id. at 159. The court must consider the following pertinent factors related to the fairness of the settlement:

"(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the relevant area of class action litigation." Scardelletti v. Debarr, 43 Fed.Appx. 525, 528 (4th Cir. 2002); Kovacs v. Ernst & Young (In re Jiffy Lube Sec. Litig.), 927 F.2d 155, 159 (4th Cir. 1991).

At the time of the proposed settlement, the case was in the initial stages of litigation. On October 25, 2004, the plaintiffs filed their complaint in Brunswick County against South Brunswick Water and Sewer Authority (SBWSA) and other individual defendants who served as SBWSA's officers and directors. The plaintiffs, acknowledging that there would be limited funds to satisfy their claims, drafted the complaint in an effort to implicate SBWSA's liability insurance. Thereafter, on November 19, 2004, SBWSA filed for relief under Chapter 9. The bankruptcy filing automatically stayed the plaintiffs' state court lawsuit, and the plaintiffs moved for relief from the automatic stay in this court. Upon permission of this court, the plaintiffs amended their complaint in April 2005. While the plaintiff's motion for relief from stay was still pending, this court ordered the parties into mediation. As a result, two extensive mediation sessions took place. Thereafter, the subject settlement was proposed prior to any answer being filed in this case.

When the settlement was proposed, no formal discovery had been conducted. The parties were aware that discovery would be a timely and expensive process. According to Dean Cunningham of the Local Government Commission (LGC), SBWSA possesses approximately 10,000 to 12,000 records in Brunswick County and Wake County, and approximately 6,000 to 7,000 of those records pertain to the subject lawsuit. Moreover, approximately 15 to 20 different directors served on SBWSA's board over the years, which could have spawned numerous depositions in this case.

4

Despite the fact that the settlement was proposed during the early stages of litigation and prior to discovery, any inference of collusion is offset by the plaintiffs' and defendants' realistic assessment of the availability of funds in the bankruptcy estate to satisfy the ultimate judgment on the merits.

The court next considers the circumstances surrounding the negotiations. At the time of reaching the settlement, the debtor had ceased its operations and had filed bankruptcy. The debtor's insurer, IRFFNC, denied any coverage for plaintiffs' claims. Because of the limited pool of resources and the insurance company's willingness to make a contribution to the settlement, SBWSA determined the settlement to be a sound business decision. The debtor's chairman of the board of directors, Dean Alan Walters, attended both mediation sessions, and SBWSA's board of directors unanimously approved settling the subject lawsuit. Mr. Cunningham of the LGC also attended the mediation sessions. In October 2003, the LGC assumed the financial operations of SBWSA. Even though the LGC did not believe the subject lawsuit to be meritorious, it approved settlement in light of SBWSA's dwindling funds.

After arriving at the terms of the settlement and receiving opposition from the Committee for Unsecured Creditors, the parties obtained the opinion of an experienced bankruptcy attorney regarding the proposed settlement. Richard M. Hutson, II, is a North Carolina Board Specialist in Bankruptcy who has practiced law in North Carolina for 41 years, has served in the capacity of trustee, and has served as counsel for business debtors, creditors, and creditors' committees. Mr. Hutson reviewed the materials provided by the parties and the Committee for Unsecured Creditors. He also conducted his own independent research. Based on the class claim of $5,250,000.00, Mr. Hutson determined that the proposed settlement would provide the class members with a 7% recovery while the general unsecured creditors would receive a 9% recovery. He considered distributions

under various scenarios and determined that the proposed settlement was fair, reasonable and favorable to all creditors. At the hearing, after reviewing Mr. Hutson's credentials, the court deemed Mr. Hutson as an expert regarding the practicality and prudence of settlement. The court found Mr. Hutson's testimony and exhibits to be compelling regarding the fairness of the settlement.

Looking at the fourth factor for consideration, the court gives appropriate deference to the judgment of experienced counsel in this case. The plaintiffs' attorneys include William R. Cherry, Jr., who practices in the areas of business and commercial law, John C. Coble, who has extensive civil litigation experience in both state and federal courts, and James O. Carter, who practices in the area of bankruptcy law and routinely appears before this court. SBWSA's counsel in the Chapter 9 case, Trawick H. Stubbs, Jr., devotes the majority of his practice to bankruptcy law. Mr. Stubbs and his associate, Laurie B. Biggs, regularly appear before this court. The defendants' counsel in the subject action, Brian E. Edes, devotes much of his practice to the areas of municipal law and commercial and business litigation and has represented other parties in adversary proceedings before this court.

Next, the court must consider the following factors relating to the adequacy of the settlement: "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigation judgment, and (5) the degree of opposition to the settlement." In re Jiffy Lube Sec. Litig., 927 F.2d at 159.

The court first considers the strength of the plaintiffs' case. The plaintiffs contend that SBWSA assessed stormwater fees on property owners in its service area, but it never used the fees for statutorily authorized purposes under N.C. Gen. Stat. § 162A-9. In July 1998, SBWSA adopted a Phase I Plan and represented that certain action items would be taken during that five-year period. The plaintiffs contend that, when the five-year period had terminated, it was clear that SBWSA had not used the fees for permissible purposes. The plaintiffs argue that SBWSA neither provided a stormwater management program that protected water quality by controlling the level of pollutants or controlling the quantity and flow of stormwater, nor did it provide a stormwater drainage system. The plaintiffs assert that, despite SBWSA's failure to use the fees for permissible purposes, SBSWA continued to collect fees and bring collection actions against the citizens of Brunswick County. The plaintiffs assert causes of action for negligence, breach of fiduciary relationship, misrepresentation, violation of the North Carolina Constitution, punitive damages as well as an action to quiet title to remove liens from class members' properties within the service area. At the hearing, the Committee for Unsecured Creditors argued that SBWSA had used the fees for permissible purposes; however, the evidence supported the plaintiffs' case.

From 1994 to the end of its operation, SBWSA billed taxpayers/landowners in Brunswick County approximately $4,475,000.00 in stormwater fees. Mr. Walters, Chairman of the Board of Directors of SBWSA, said that no stormwater infrastructure had ever been put into place to control the level of pollutants, the quantity and flow of stormwater, or to provide a drainage system in the service area. It was his sentiments that SBWSA needed to stop charging the public for services that it was not providing. On April 20, 2003, the District Court of Brunswick County granted summary judgment in favor of the taxpayers/landowners who had been sued by SBWSA for failure to pay

stormwater fees. Mr. Walters said that SBWSA did not appeal the decision because, at that point, it did not have the necessary income or the credibility to proceed with its operations.

Bradley Bennett, Supervisor of the Stormwater Unit of the North Carolina Division of Water Quality, explained the application process for SBWSA to obtain permits for operation. Mr. Bennett discussed the goals of the Phase I plan contained in the Final Environmental Impact Statement of July 1998 ("the Statement"). The Statement included a letter from the executive direct of SBWSA, which reads in part:

> Phase 1 Stormwater Master plan provides an outline of the recommended stormwater management policies and actions for the entire service area over the next five years. The document also provides immediate and specific recommended 'first steps' to correct many of the obvious water quality and quantity problems that plague the southwestern area of Brunswick County.

Letter from Joseph A. Tombro, Executive Director, SBWSA to Readers (Jul. 8, 1998). Mr. Bennett agreed that what was contemplated in the Phase I five-year plan was to be completed before moving to Phase II. Action items for Phase I included water quality monitoring and sampling, a revision to the stormwater management ordinance, implementation of a local erosion and sediment control program, stormwater modeling, a maintenance program, a service rate study to assess charges and fees of the stormwater utility, a golf course cooperative environmental plan, the implementation of a regional BMP and riparian buffer programs, development of a drainage system inventory, acquisition of easements, use of a geographic information system, development of a pollution prevention program, public education, development of stormwater drainage system design criteria and standards, and the development of a capital improvement program. It was recommended that $450,000.00 a year be used toward these action items. Mr. Bennett was unaware of whether any Phase I action items, which would have provided stormwater infrastructure or maintenance personnel

and equipment, had ever been completed. Moreover, he had no knowledge of how SBWSA had used the stormwater fees.

James Michael Chandler, who has provided auditing services to SBWSA since 2002, testified regarding how SBWSA spent its funds. Aside from its executive director, SBWSA only had four employees who exclusively performed administrative office work, including the filing of collection actions, the billing and posting of fees, and accounting services. Mr. Chandler stated that stormwater fees had been used for these administrative purposes and to pay for monitoring services provided by the University of North Carolina at Wilmington (UNCW). SBWSA also paid URS Greiner to perform engineering and surveying services and to prepare the necessary documentation for the permit application process. Mr. Chandler clarified that SBWSA had not hired any personnel to perform work in the field for purposes of erecting stormwater infrastructure. The 2004 fiscal report states: "Although a substantial amount of planning, engineering and surveying has already been performed on the Water Quality Management Fund Capital Project, actual construction has not yet begun." South Brunswick Water and Sewer Authority, Financial Statement and Auditor's Report for Fiscal Year Ending June 30, 2004 at 11 (2004). Mr. Chandler said that SBWSA had created funds for specific purposes and that sometimes money would be transferred from one fund to another. Mr. Chandler was aware of a specific incident in 2002 where the Water Quality Management Fund had loaned money to the Package Plant Fund, which was a fund unrelated to stormwater. The money had not been repaid to the appropriate fund until after the 2002 auditing year.

Lawrence B. Calhoun, a professor of marine biology, testified regarding the water quality monitoring services provided by UNCW to SBWSA from 1996 through 2003. Over the seven-year period, UNCW charged SBWSA approximately $1,000,000.00 for its services. Under the monitoring

9

program, research assistants collected water samples approximately every three weeks from established monitoring locations within the SBWSA service area and then transported the water back to the university laboratory for analysis. The aim was to establish a baseline that showed the seasonal and storm event patterns in water quality, the range of variability in water quality parameters, and the identity of problem areas. Mr. Calhoun testified that, within a one-year period, UNCW had a baseline for use in the permit application process. UNCW provided its data to URS Greiner, the engineering consultant used by SBWSA. Greiner used UNCW's data for purposes of calculating pollutant loadings, for predicting the effects of certain courses of action, and for preparing the statements and reports needed for the permitting process. GIS mapping and aerial photography was also provided, which pinpointed problem areas within the service area.

Professor Calhoun maintained a website that reported findings from the UNCW monitoring program. He attended monthly SBWSA board meetings, and he and his staff reported problem areas to SBWSA's executive director or to state authorities. However, Mr. Calhoun was unaware of SBWSA's hiring of maintenance staff to perform services and was unaware of any physical infrastructure that had been erected by SBWSA for controlling the level of pollutants, directing the quantity and flow of water, or serving as a drainage system.

In support of their claim, the plaintiffs refer to the case of <u>Smith Chapel Baptist Church v. City of Durham</u>, 350 N.C. 805, 517 S.E.2d 874 (1999). The case discusses the history of how Congress enacted the National Pollutant Discharge Elimination System (NPDES) but did not provide states with funding for comprehensive stormwater management programs. <u>Id.</u> at 808. In 1989, in an effort to support local municipal storm sewer systems, the North Carolina General Assembly ratified a bill authorizing local governments to construct and operate storm drainage systems as public

enterprises and providing local governments with funding and taxing authority to finance the construction and operation of those systems. Id. (referring to Act of July 15, 1989, 1989 N.C. Sess. Laws 643). As part of the Act, the General Assembly defined public enterprise to include "structural and natural stormwater and drainage systems of all types." Id. (quoting N.C. Gen. Stat. § 160A-311 (1994)).

In the Smith Chapel case, the City of Durham adopted an ordinance, which created a stormwater utility to finance a stormwater management plan and to impose utility fees on property owners. Id. at 809. A number of churches challenged the ordinance and utility fees, asserting that the ordinance exceeded the city's enabling authority, pursuant to §§ 160A-311 and 160A-314, that it violated the express limitation on stormwater fees, pursuant to § 160A-314(a1), and that it provided for utility fees that did not correspond to services provided. Id. at 809. The trial court found that the ordinance and utility fees were invalid, as they exceeded the city's authority granted by statute. Id. The trial court held that the churches were entitled to a full refund, plus interest, on those fees paid to the date of the judgment. Id. The Supreme Court of North Carolina affirmed the ruling of the trial court, including the refund to the churches based upon equitable principles of unjust enrichment. Id. at 818. In arriving at its decision that the city had exceeded its authority, the Supreme Court of North Carolina analyzed the plain language of §§ 160A-314(a1) and 160A-311 as well as the title of the act that added the statutory provisions regarding stormwater. Id. at 811-812. It compared the statutory language with the language of the city ordinance and applicable documents describing the stormwater program. Id. at 812-814. The court concluded that "little of the program's emphasis [was] on the maintenance and construction of a structural and natural stormwater and drainage system;" rather, "[t]he program instead focus[ed] on educational programs, guidance manuals, used oil recycling,

household hazardous waste collection, and enforcement efforts against illegal dumping of hazardous materials." Id. at 814-815.

The Committee for Unsecured Creditors asserted that the decision in Smith Chapel no longer carried weight because the General Assembly had amended the applicable statutes retroactively to expand the purposes for which fees may be imposed and used by cities, towns, and authorities that operate stormwater programs. The Committee asserts that, based upon the applicable amendments, SBWSA did not exceed its statutory authority.

Despite the 2000 amendments, Smith Chapel remains instructive regarding the analysis a court should undertake in reviewing whether a government unit has exceeded it statutory authority and the adequate remedies afforded to the public when the grant of authority is exceeded. Smith Chapel instructs the court to consider the title of the act in ascertaining the intent of the legislature. Smith Chapel, 350 N.C. at 812. In 2000, the General Assembly ratified the bill, titled "An Act to Clarify That Stormwater Utility Fees May Be Used To Fund All Costs of Stormwater Management Programs, As Recommended by the Environmental Review Commission." Act of June 30, 2000, 2000 N.C. Sess. Laws 70. It is clear from reading the title of the act that the new law was intended to broaden the scope of permissible costs to include all costs of stormwater management programs.

The court considers the plain language of the statutes. Smith Chapel, 350 N.C. at 811. Amended § 162A-9, which is applicable to an authority like SBWSA, is effective retroactively to July 8, 1991 and applies to the period of time SBWSA was assessing and using fees in its service area. N.C. Gen. Stat. § 162A-9, Act of June 30, 2000, 2000 N.C. Sess. Laws 70. Section 162A-9 enables an authority to establish rates, fees, and charges for the "services furnished or to be furnished by any water system . . . ." N.C. Gen. Stat. 162A-9(a). A water system includes "stormwater management

programs designed to protect water quality by controlling the level of pollutants in, and the quality and flow of, stormwater and structural and natural stormwater and drainage systems of all types . . . . " N.C. Gen. Stat. § 162A-2(12); Act of June 30, 2000, 2000 N.C. Sess. Laws 70 (stating that the amendments to § 162A-2(12) are effective retroactively to July 8, 1991). Section 162A-9 clarifies that any necessary costs for the management of stormwater quality and quantity are authorized and states, in pertinent part:

> Rates, fees, and charges imposed under this subsection for stormwater management programs and stormwater and drainage system service may not exceed the authority's cost of providing a stormwater management program and a structural and natural stormwater and drainage system. **The authority's cost of providing a stormwater management program and a structural and natural stormwater and drainage system includes any costs necessary to assure that all aspects of stormwater quality and quantity are managed in accordance with federal and State laws, regulations, and rules**.

N.C. Gen. Stat. § 162A-9 (emphasis added). Based on the evidence presented to the court, SBWSA did not use stormwater fees for these purposes; rather, it used the fees for administrative billing and enforcement purposes, for water monitoring, for GIS mapping and aerial photography, and for planning and reporting activities associated with the permit application process. While these activities were not illegal, they did not fall under the scope of § 162A-9 and should have been funded by other sources. To protect against possible abuses of the authority under § 162A-9, the General Assembly directs an authority to hold funds received pursuant to statutory authority in trust to be applied only for statutorily authorized purposes. N.C. Gen. Stat. § 162A-11 (stating "[a]ll moneys received pursuant to the authority of this Article shall be deemed to be trust funds, to be held and applied solely as provided in this Article."). Thus, SBWSA had a duty to hold the money in trust and use it for purposes authorized under § 162A-9. The evidence presented at the hearing supports that SBWSA failed to honor that statutory duty.

Next, the court considers the strongest defenses the plaintiffs would likely encounter if the case went to trial. The Committee asserted that the defendants could have raised the three-year statute of limitations, pursuant to N.C. Gen. Stat. § 1-52, against the plaintiffs' claims of negligence, breach of fiduciary duty, and misrepresentation. The Committee argued that the three-year statute of limitations for the alleged tort claims was triggered when SBWSA collected and used fees as early as 1996.

A negligence claim is governed by § 1-52(5). White v. Consol. Planning, Inc., 166 N.C.App. 283, 308, 603 S.E.2d 147, 164 (N.C. Ct. App. 2004). The cause of action accrues "when the wrong giving rise to the right to bring suit is committed, even though the damages at that time [are] nominal and the injuries cannot be discovered until a later date." Harrold v. Dowd, 149 N.C.App. 777, 781, 561 S.E.2d 914, 918 (N.C. Ct. App. 2002). Specifically, the cause of action accrues when "the wrong is complete." Fulton v. Vickery, 73 N.C.App. 382, 389, 326 S.E.2d 354, 359 (N.C. Ct. App. 1985). The alleged wrong in this case is the use of fees for statutorily unauthorized purposes. The 2004 Financial Statement and Auditor's Report reflects that, until the LGC assumed the financial operations of SBWSA in October 2003, SBWSA was still paying half of the salaries of its administrative staff and general expenses from the stormwater fees that it was collecting under the authority of N.C. Gen. Stat. § 162A-9. Based on the evidence at the hearing, these expenses did not fall within the confines of § 162A-9. The plaintiffs timely filed their lawsuit on October 25, 2004.

A negligence claim alleging purely a pecuniary loss does not have a "discovery rule" and is not privy to the discovery language set forth in § 1-52(16). White v. Consol. Planning, Inc., 166 N.C.App. 283, 308, 603 S.E.2d 147, 164 (N.C. Ct. App. 2004). At the hearing, the plaintiffs argued that, not until the Phase I five-year plan period had terminated on June 30, 2003, did the plaintiffs

14

know whether SBWSA had used the fees for permissible purposes. The plaintiffs' theory hinges upon an accrual date triggered by discovery. In this case, in addition to pecuniary loss, the plaintiffs allege that their respective properties were damaged, as they were deprived of stormwater protection. Thus, the allegation of property damage due to deprivation of stormwater protection arguably brings the plaintiffs' negligence claim within the realm of N.C. Gen. Stat. § 1-52(16), triggering the statute of limitations when physical property damage "becomes apparent or ought reasonably to have become apparent" but no "more than 10 years from the last act or omission of the defendant." Because SBWSA allotted a five-year period to perform certain action items, the plaintiffs assert that they did not know whether their property had been afforded stormwater protection until after that period had terminated. If the five-year period ending June 30, 2003 is the definitive trigger date, and the plaintiffs filed their lawsuit in Brunswick County on October 25, 2004, then the negligence claim is timely. Either using the completion date of the alleged wrong or using the discovery date asserted by the plaintiffs, the negligent claim falls within the prescribed limitations period.

The other tort claims alleged by the plaintiffs include a discovery component. A misrepresentation or fraud claim accrues under North Carolina law when the aggrieved party discovers facts constituting the fraud. Hunter v. Guardian Life Ins. Co. of America, 162 N.C.App. 477, 593 S.E.2d 595 (N.C. Ct. App. 2004)(stating that the three-year statute of limitations under § 1-52(9) is applicable). A negligent misrepresentation claim accrues when the claimant suffers harm because of the misrepresentation and the claimant discovers the misrepresentation. Barger v. McCoy Hillard & Parks, 346 N.C. 650, 666, 488 S.E.2d 215, 224 (1997)(stating that the three-year statute of limitations under § 1-52(5) is applicable). A breach of fiduciary claim accrues "when the claimant knew or, by due diligence, should have known of the facts constituting the basis for the claim." Toomer v. Branch

Banking & Trust Co., 171 N.C.App. 58, 68-69, 614 S.E.2d 328, 336 (N.C. Ct. App. 2005)(stating that a claim for breach of fiduciary duty that does not rise to the level of constructive fraud is governed by the three-year statute of limitations under § 1-52(1); however, a claim of constructive fraud based upon breach of a fiduciary duty has a ten-year statute of limitations under § 1-56). The court finds the plaintiffs' position to be sound regarding the discovery date for these claims. The plaintiffs could not have known the basis of their claims until after the five-year period had terminated, as SBWSA had allotted itself five years for certain action items to be taken. Accordingly, the claims are timely.

   The Committee for Unsecured Creditors also argued that an authority, like SBWSA, does not owe a duty to the general public and cannot be liable for the alleged tortious conduct. The Committee cited to cases where the public duty doctrine barred claims against government entities for the physical injury or death of members of the public. Hunt v. NC Dept. of Labor, 348 N.C. 192. 499 S.E.2d 747 (1998); Tise v. Yates Constr. Co., Inc., 345 N.C. 456, 480 S.E.2d 677 (1997);. Braswell v. Braswell, 330 N.C. 363, 410 S.E.2d 897 (1991). North Carolina adopted the public duty doctrine in Braswell, stating that "a municipality and its agents act for the benefit of the public, and therefore, there is no liability for the failure to furnish police protection to specific individuals." Braswell, 330 N.C. at 370, 410 S.E.2d at 901. The Supreme Court of North Carolina clarified, however, that the public duty doctrine is limited to government agencies involved in law enforcement where they are exercising their general duties to protect the public. Wood v. Guilford County, 355 N.C. 161, 166, 558 S.E.2d 490, 495 (2002); Lovelace v. Shelby, 351 N.C. 458, 461, 526 S.E.2d 652, 654 (2000); Thompson v. Waters, 351 NC. 462, 465, 526 S.E.2d 650, 652 (2000). The North Carolina Court of Appeals reiterated this limitation of the doctrine in a recent 2006 decision. Multiple Claimants v. NC Dept. of Health & Human Services, 626 S.E.2d 666, 674 (N.C. Ct. App. 2006). Such a defense would not be

applicable to a government entity established to provide water or sewer services. *See* Davidson County v. City of High Point, 321 N.C. 252, 362 S.E.2d 553 (1987)(stating that the city had a statutory duty under Chapter 160A to provide sewer services to its residents). As an authority under Chapter 162A of the North Carolina General Statutes, SBWSA had a statutory duty to hold stormwater fees in trust and to use them for statutorily authorized purposes. N.C. Gen. Stat. § 162A-11.

The Committee also criticized SBWSA for failing to consider the defense of government immunity. Based on a reading of applicable case law, it is clear that the plaintiffs could overcome this defense. The operation of public services, such as the provision of natural gas, sanitary facilities, water, and electricity, is considered a proprietary function. Gregory v. City of Kings Mountain, 117 N.C.App. 99, 104, 450 S.E.2d 349, 353 (N.C. Ct. App. 1994). Government entities also act in a proprietary role in setting rates for these types of services. Pulliam v. City of Greensboro, 103 N.C.App. 748, 407 S.E.2d 567 (N.C. Ct. App. 1991). A municipality is not immune from liability for engaging in a proprietary function. Gregory, 117 N.C.App. at 104, 450 S.E.2d at 353-354 (holding that, in operating a gas supply utility, the city was engaged in a proprietary function and was not immune under the doctrine of government immunity from liability for any torts which were proximately caused by providing that service); Pulliam, 103 N.C.App. at 754, 407 S.E.2d at 570 (holding that city's operation of a sewer system was a proprietary function, and the city was not entitled to government immunity from tort liability for operating that system). This is consistent with the general trend to restrict rather than to expand the application of government immunity. Pulliam, 103 N.C.App. at 754, 407 S.E.2d at 570.

Next, the court considers the anticipated duration and expense of additional litigation. If this case was litigated to judgment, SBWSA would incur additional administrative expenses that would

swallow its available funds. Discovery and trial would be a timely and expensive process in this case. The Committee suggested that the court conduct an estimation hearing to value the plaintiffs' claims. Mr. Hudson, who provided expert testimony regarding the reasonableness of the settlement, stated that an estimation hearing would last approximately 3 to 4 days depending on the number of witnesses. With the number of attorneys that would be attending the estimation hearing, the finite pool of money would be significantly depleted by administrative expenses before any creditors would receive a distribution.

Fourth, the court considers the solvency of the defendants and the likelihood of recovery on a litigated judgment. SBWSA, which holds the limited pool of money in this case, has declared bankruptcy and is no longer operating. When the bankruptcy case was filed, SBWSA had approximately $998,000.00 in its account. As of the subject hearing date, only $668,000.00 remained in the account due to the payment of professional fees. Mr. Cunningham of the LGC estimated that 35% of those professional fees were directly related to the subject lawsuit. Clearly, SBWSA would not have sufficient funds to cover a judgment in favor of the plaintiffs. Moreover, as noted above, SBWSA's insurer denied any coverage of plaintiffs' claims.

Finally, the court considers the degree of opposition to the settlement. While the Committee for Unsecured Creditors objects to the settlement, the primary concern of Rule 23(e) is "the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." Kovacs v. Ernst & Young (In re Jiffy Lube Sec. Litig.), 927 F.2d 155, 158 (4th Cir. 1991). The class members were adequately noticed regarding the settlement, and no class members raised objections.

Balancing all of the factors in light of the written submissions and evidence presented at the

hearing, the court finds that the settlement is fair, reasonable and adequate and in the best interests of the class as a whole. Accordingly, the proposed settlement noticed to class members is approved.

"END OF DOCUMENT"